# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTICANCER, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CELLSIGHT TECHNOLOGIES, INC., a Delaware corporation; and DOES 1–50,<br><br>Defendant. | CASE NO. 10CV2515 JLS (RBB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>(ECF No. 36) |

Presently before the Court is Defendant CellSight Technologies, Inc.'s ("CellSight") Motion for Partial Summary Judgment. (MSJ, ECF No. 36) Also before the Court are Plaintiff AntiCancer, Inc.'s ("AntiCancer") response in opposition, (Resp. in Opp'n, ECF No. 43), and CellSight's reply in support, (Reply in Supp., ECF No. 45). The Court heard oral argument on July 16, 2012, and the matter was thereafter taken under submission. Having considered the parties' arguments, the evidence, and the law, the Court **GRANTS IN PART AND DENIES IN PART** CellSight's motion.

## BACKGROUND

On December 8, 2010, AntiCancer filed this action against CellSight, asserting the following claims: (1) infringement of U.S. Patent No. 6,759,038 ("the '038 patent") and U.S. Patent No. 6,649,159 ("the '159 patent"); (2) copyright infringement; (3) violation of the Lanham Act; and (4) common law and statutory unfair competition. (Compl., ECF No. 1) CellSight answered on January 18, 2011, (Answer, ECF No. 5), and the Court adopted the parties' agreed-

upon claim constructions on November 16, 2011, (Order, Nov. 16 2011, ECF No. 20). Then, on May 17, 2012, CellSight filed the instant motion for partial summary judgment. (MSJ, ECF No. 36)

**1. Patent Infringement Claims**

AntiCancer contends that CellSight has infringed and is infringing the '159 patent, titled "Whole-Body Optical Imaging of Gene Expression and Uses Thereof," '159 patent, at [54], and the '038 patent, titled "Metastasis Models Using Green Fluorescent Protein (GFP) as a Marker," '038 patent, at [54].

*A. The '159 Patent*

The '159 patent relates to "the whole-body external optical imaging of gene expression." '159 patent, at [57]. Relevant here, Claim 1 of the '159 patent recites "[a] method to monitor the ability of a promoter to promote expression in an animal of an endogenous gene[1] that is controlled by said promoter . . . . ." '159 patent col.24 ll.44–46. The method comprises two elements:

- Element 1: "[D]elivering, to an animal, cells containing a nucleic acid encoding a fluorophore[2] operatively linked to the promoter of said endogenous gene whose ability to promote expression is to be analyzed." '159 patent col.24 ll.47–50.

- Element 2: "[O]bserving the presence, absence or intensity of the fluorescence[3] generated by said fluorophore at various locations in said

---

[1] The term "endogenous gene" is defined in the joint claim construction as "a gene native to the animal being studied." (Joint Claim Construction Chart 1, ECF No. 16-1)

[2] The term "fluorophore" is defined in the joint claim construction as "a protein that is auto-fluorescent such that no substrates or co-factors are needed for it to fluoresce." (Joint Claim Construction Chart 2, ECF No. 16-1)

[3] The term "fluorescence" is defined in the joint claim construction as follows:

> [E]mission of a longer wavelength light by a substance when it is being excited by shorter wavelength light (such as, e.g., the emission of green light by GFP when excited by blue or ultraviolet light), where the light emission continues only as long as the exciting light is shining on the substance.

(Joint Claim Construction Chart 2–3, ECF No. 16-1)

animal by whole-body external fluorescent optical imaging.[4]" '159 patent col.24 ll.52–56.

**B. The '038 Patent**

The '038 patent covers "[a] method to follow the progression of metastasis of a primary tumor . . . ." '038 patent, at [57]. Relevant here, Claim 1 of the '038 patent recites "[a] method to evaluate a candidate protocol or drug for the inhibition of metastasis of a primary tumor . . . ." '038 patent col.13 ll.58–59. The claim requires "monitoring the progression of metastasis by observing the presence, absence or intensity of the fluorescence at various locations in the treated subject," '038 patent col.13 ll.65–67, and "monitoring the progression of metastasis in a control, which contains a similar tumor that expresses green fluorescent protein," '038 patent col. 14 ll.5–7.

Claim 5 of the '038 patent covers "[a] method to monitor metastasis of a primary tumor in a subject . . . which contains said primary tumor, and wherein said tumor stably expresses green fluorescent protein (GFP)[5] in cells of said tumor when said tumor metastasizes." '038 patent col.14 ll.37–41. The method of Claim 5 "comprises monitoring the progression of metastasis by observing the presence, absence or intensity of the fluorescence as a function of time at various

---

[4] The term "whole-body external fluorescent optical imaging" is defined in the joint claim construction as follows:

> An imaging process in which the presence, absence or intensity of the fluorescence generated by the fluorophore at various locations in the host organism is monitored, recorded and/or analyzed externally, in real time and on a continuous basis, without any procedure, e.g., surgical procedure, to expose and/or excise the desired observing site from the host organism.

(Joint Claim Construction Chart 3, ECF No. 16-1)

[5] The term "green fluorescent protein (GFP)" is defined in the joint claim construction as follows:

> [A] protein that emits light upon incidence of an excitation; includes the native gene encoding GFP from *Aequorea victoria*; includes mutants found useful to enhance expression and to modify excitation and fluorescence; includes various forms of GFP including those which exhibit green color and colors other than green; includes but is not limited to GFP which have been isolate from other organisms, such as *Renilla reriformis*.

(Joint Claim Construction Chart 6–7, ECF No. 16-1)

locations in said subject wherein said subject is intact." '038 patent col.14 ll.46–49.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 permits a court to grant summary judgment where (1) the moving party demonstrates the absence of a genuine issue of material fact and (2) entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material," for purposes of Rule 56, means that the fact, under governing substantive law, could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). For a dispute to be "genuine," a reasonable jury must be able to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In the context of patent litigation, "[i]nfringement is assessed by comparing the accused device to the claims; the accused device infringes if it incorporates every limitation, either literally or under the doctrine of equivalents. If, however, even one claim limitation is missing or not met, there is no literal infringement." *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1352 (Fed. Cir. 2005) (internal quotation marks omitted) (citations omitted); *accord Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1565 (Fed. Cir. 1997).

## ANALYSIS

**1. Claims for which AntiCancer Does Not Oppose Summary Judgment**

*A. Lanham Act Claim*

In its complaint, AntiCancer asserted that CellSight violated the Lanham Act by using a photograph of a mouse being fluoresced in a section of its website generally describing imaging technology. (Compl. ¶¶ 48–53, ECF No. 1) CellSight moves for summary judgment as to this claim, arguing that AntiCancer cannot be granted trademark protection to its copyrighted work, among other things. (MSJ 11–14, ECF No. 36) "AntiCancer does not oppose CellSight's motion for partial summary judgment on the fourth claim of its complaint, for violating the Lanham Act," (Resp. in Opp'n 10, ECF No. 43), and so the Court **GRANTS** summary judgment as to this claim.

### B. Copyright and Trademark Damages Claims

AntiCancer also asserted copyright and trademark claims, seeking "nominal damages" for these claims. (MSJ 15, ECF No. 36) CellSight moves for summary judgment as to these damages claims, asserting that it is entitled to summary judgment because AntiCancer has no proof of actual damages. (*Id.*) "AntiCancer . . . does not oppose CellSight's motion for partial summary judgment on damages with respect to copyright and trademark claims," (Resp. in Opp'n 10, ECF No. 43), and so the Court **GRANTS** CellSight's motion for partial summary judgment on damages with respect to these claims. Because AntiCancer seeks no other damages under its copyright claim, summary judgment is **GRANTED** as to this claim in its entirety.

### 2. Patent Infringement Claims

CellSight moves for summary judgement on claims one and two for patent infringement of the '038 patent and '159 patent, respectively.

### A. In Vivo *Fluorescent Imaging*

CellSight's first argument, pertaining to both patents, is that it does not and has not infringed the second element of Claim 1 of the '159 patent, (MSJ 8, ECF No. 36), or the methods claimed in Claims 1 and 5 of the '038 patent, (*id.* at 9), because these claims require the use of *in vivo* fluorescent imaging, which CellSight has not used.

In its motion, CellSight distinguishes between three types of imaging technology: (1) fluorescence imaging, (2) bioluminescence imaging, and (3) PET imaging. (*Id.* at 1–2) In short, CellSight describes the various imaging techniques as follows: Fluorescence imaging and bioluminescence imaging are both optical imaging techniques that measure light wavelengths to track activity in a given location (for example, to track tumor growth in an animal). Fluorescence imaging is characterized by non-invasively shining light on an animal containing an auto-fluorescent protein and measuring the wavelength of the light that re-emits from within the animal. Bioluminescence imaging non-invasively measures the wavelength of the light emitted from within an animal due to a biochemical reaction, and does not rely on any external light source. And finally, PET imaging utilizes radiation rather than optical techniques to track activity in a given location. It non-invasively tracks the location of radioactive molecules within an animal by

1  emitting positrons that annihilate to form two gamma rays emitted in opposite directions. The
2  gamma rays are detected by the PET scanner to form an accurate measurement and imaging of the
3  radiation distribution within the animal. Neither bioluminescence imaging nor PET imaging
4  involve the use of fluorescence. (*Id.*) And, according to CellSight, the asserted patents cover
5  fluorescence imaging, not bioluminescence or PET imaging: "The Asserted Patents relate to the
6  imaging of animals with a fluorescence protein that glows when imaged,"—also known as "*in vivo*
7  fluorescent imaging." (*Id.* at 5–6 (footnote omitted))

8      CellSight believes bioluminescence or PET imaging techniques are superior to
9  fluorescence imaging, and as such it asserts that it does not use fluorescence imaging techniques in
10 its practice. (*Id.* at 3) This assertion is supported by the expert report of Dr. David Stout
11 ("Stout"), (App. ISO MSJ Ex. C, ECF No. 38), and the declarations of Shahriar Yaghoubi,
12 (Yaghoubi Decl., ECF No. 36-13), Aruna Gambhir, (Gambhir Decl., ECF No. 36-14), and Henry
13 F. VanBroklin, (VanBroklin Decl., ECF No. 36-12). Thus, the main thrust of CellSight's
14 argument is that it "does not use *in vivo* fluorescent imaging" and therefore could not be infringing
15 either the '159 or '038 patent. (MSJ 8, ECF No. 36)

16     AntiCancer does not disagree with CellSight's characterization of the patents, or its
17 summary of the different imaging techniques. Instead, AntiCancer contests CellSight's assertion
18 that CellSight does not use fluorescence imaging. In opposition and in support of its theory of
19 infringement, AntiCancer points to a research paper, titled "Structure-guided Engineering of
20 Human Thymidine Kinase 2 as a Positron Emission Tomography Reporter Gene for Enhanced
21 Phosphorylation of Non-natural Thymidine Analog Reporter Probe" ("PRG Imaging Paper"[6]).
22 According to AntiCancer, the PRG Imaging Paper "shows clear evidence infringement" by
23 CellSight. (Resp. in Opp'n 2, ECF No. 43) AntiCancer's expert, Dr. Robert M. Hoffman

---

[6] Though the abbreviated reference to the paper is irrelevant to the ultimate determination of this motion, the parties utilized different abbreviations in their briefs—CellSight using "The PET Report," and AntiCancer preferring "CellSight 2012 paper"—and even took the time to address this point of contention in their briefing. (*See* Resp. in Opp'n 2, ECF No. 43); (Reply in Supp. 5 n.2, ECF No. 45) Rather than picking sides on this irrelevant issue, the Court will use "PRG Imaging Paper," which more accurately abbreviates the subject of the paper: "Positron emission tomography (PET) reporter gene imaging," or, "PRG imaging." (App. ISO MSJ Ex. I, ECF No. 36-7 (PRG Imaging Paper))

("Hoffman"), summarizes in his expert report that the researchers must have "imaged *in vivo*" mice that had been injected subcutaneously with yellow fluorescent protein ("YFP") labeled tumors in order to conduct the research described in the PRG Imaging Paper. (App. ISO MSJ Ex. A, at 4,[7] ECF No. 36-3 (Hoffman Expert Report)) Hoffman asserts that "[t]he identification of the location and size of YFP-expressing tumors must have been made possible by imaging of the YFP fluorescence." (*Id.* at 5)

Hoffman's conclusion that the researchers must have used *in vivo* fluorescent imaging is based in large part by reference to several figures in the PRG Imaging Paper where "the authors put dashed lines to depict a circle or elipse [sic] representing the sites and size of the YFP-expressing tumors." (*Id.* at 4) CellSight counters that these references do not show the use of YFP for *in vivo* fluorescence imaging, but rather they refer "to a cell line that contains the YFP/PRG PET imaging construct," and that "the illustration referenced by Dr. Hoffman depicts PET imaging in a mouse using the PET construct that is the subject of the report." (MSJ 10, ECF No. 36)

And so, the parties' dispute boils down to a single issue: Did the research described in the PRG Imaging Paper utilize *in vivo* fluorescent imaging? This fact is obviously disputed—AntiCancer's expert says that the researchers did use *in vivo* fluorescent imaging; CellSight's experts say that they did not—and it is certainly material—if *in vivo* fluorescent imaging was used, that fact weighs in favor of a finding of infringement and could affect the outcome of this infringement lawsuit.

CellSight argues, however, that Hoffman's testimony should be stricken, leaving AntiCancer with no expert testimony and no evidence that CellSight has infringed. According to CellSight, Hoffman's testimony "is speculation not qualified as expert opinion,[8] constitutes and is

---

[7] Pin cites to the exhibits utilize the page numbers assigned by CM/ECF.

[8] To the extent CellSight seeks to do so, the Court declines to exclude Hoffman's expert testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), at this stage of the proceedings. The Court does not believe that AntiCancer's proffer of Hoffman as an expert is obviously defective, and declines to resolve the expert admissibility issues on the record before it. *See Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997) (discussing the intersection of *Daubert* and summary judgment practice and concluding that "courts must be cautious—except when defects are obvious on the face of a proffer—not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend

based on hearsay and lacks the foundation of personal knowledge necessary to render it admissible." (Reply in Supp. 7, ECF No. 45)  Specifically, CellSight asserts that Hoffman's opinion that the PRG Imaging Paper discloses CellSight's use of *in vivo* fluorescent imaging is mere speculation, and that he has no personal knowledge of the procedures used in the study. (MSJ 10–11, ECF No. 36)

Though it may be true that Hoffman did not participate in the research underlying the PRG Imaging Paper, he has had extensive experience in this area of research.  (*See* App. ISO MSJ Ex. A, at 10–93, ECF No. 36-3 (Hoffman's curriculum vitae))  It is therefore not inconceivable that he might have some idea—or could make a reasonable inference—what research methods were utilized to conduct a certain type of study.  And, based on his review of the paper, Hoffman opines that "[i]n Figures 2 and 4, the authors indicate the presence of the YFP tumors within dashed lines to form a circle or ellipse and labled 'YFP.'  The identification of the location and size of YFP-expressing tumors must have been made possible by imaging of the YFP fluorescence." (*Id.* at 5) That the actual researchers' declarations regarding their own research methods might be more convincing or credible than Hoffman's conclusions is a determination for the jury.  Based on the record before it, and drawing all inferences in favor of AntiCancer, the Court finds that there is a genuine issue whether the research described in the PRG Imaging Paper utilized *in vivo* fluorescent imaging.

### B. CellSight's Involvement in the Research Described in the PRG Imaging Paper

Also pertaining to both patents, CellSight argues that Hoffman merely "speculates about CellSight's possible involvement in the research described in the [PRG Imaging Paper]," but in reality the PRG Imaging Paper "does not describe any work or data performed or developed by CellSight." (MSJ 10, ECF No. 36)  In other words, because the only evidence AntiCancer points to in support of its theory of infringement is the PRG Imaging Paper, and because CellSight had no involvement in that research, AntiCancer has not asserted any basis for infringement *by CellSight*. (*See id.*)

---

its admissibility"). Indeed, because CellSight raised its Federal Rule of Evidence 702 challenge in its reply brief, AntiCancer has not even had an opportunity to oppose the motion.

In support of this argument, CellSight submits a declaration from an author of the PRG Imaging Paper, Shahriar Yaghoubi ("Yaghoubi"), wherein he states that "[t]he research relating to this paper was performed at UCLA in Los Angeles California. None of the work was done by CellSight. CellSight did not contribute any data, perform any research or perform any imaging for [the PRG Imaging Paper]." (Decl. of Shahriar Yaghoubi ISO MSJ ("Yaghoubi Decl.") ¶ 5, ECF No. 36-13) Caius G. Radu ("Radu"), the senior author of the PRG Imaging Paper, states the same, (Decl. of Caius G. Radu ISO MSJ ("Radu Decl.") ¶ 3, ECF No. 36-10), and CellSight's expert concurs, (App. ISO MSJ Ex. C, ECF No. 38 ("This work was done as part of an academic project at UCLA. There was no work done by CellSight.")) 

To the contrary, AntiCancer—through its expert, Hoffman—asserts that CellSight's involvement in the PRG Imaging Paper research is clear on the face of the PRG Imaging Paper. (*See* Resp. in Opp'n 9, ECF No. 43 (citing Resp. in Opp'n Ex. 3, at 2–3, ECF No. 43-3 (Hoffman Supplemental Expert Report))) Hoffman notes the following:

> Dr. Yaghoubi[, the second author of the PRG Imaging Report,] is the Chief Scientific Officer at Cell Sight. Dr. Yaghoubi lists his Cell Sight affiliation in the author's byline. . . . Dr. Yaghoubi also lists his Cell Sight affiliation in the conflicts-of-interest section of the [PRG Imaging Paper] and states that Cell Sight has licensed the patent covering work described in the [PRG Imaging Paper].

(Resp. in Opp'n Ex. 3, at 2–3, ECF No. 43-3) The Court's own review of the PRG Imaging Paper confirms Hoffman's remarks. Moreover, Hoffman concludes that "The [PRG Imaging Paper] greatly benefitted Cell Sight as it was intended to do." (*Id.* at 3)

Again, while the declaration of the authors of the PRG Imaging Paper might ultimately be deemed more credible and convincing than the conclusions of AntiCancer's expert, that is a determination for the jury. Based on the multiple references to CellSight in the PRG Imaging Paper and Hoffman's opinion that this denotes CellSight's involvement in that research,[9] there is a genuine issue whether CellSight participated in the allegedly infringing research described in that paper.

---

[9] Indeed, considering Hoffman's extensive experience in publishing research studies, (*See* App. ISO MSJ Ex. A, at 10–93, ECF No. 36-3), it can reasonably be inferred that he could tell from the authorship byline and conflict-of-interest section whether CellSight was involved in the underlying research of the PRG Imaging Paper.

*C. The '159 Patent*

Pertaining only the '159 patent, CellSight alternatively argues that it does not infringe Claim 1 of the '159 patent because "the imaging services performed by CellSight have not involved monitoring of endogenous promoter genes . . . ." (MSJ 8, ECF No. 36) CellSight offers no further argument on this point, simply citing Stout's expert report and a print out from CellSight's website describing the technology it uses. (*See id.* (citing (App. ISO MSJ Exs. B, C, ECF No. 38))) According to Stout, the PRG Imaging Paper "is directed towards PET reporter genes and does not include the use or monitoring of endogenous promoters." (App. ISO MSJ Ex. C, at 128, ECF No. 38) In its briefing, AntiCancer offered no opposition argument or evidence, (*see* Resp. in Opp'n 5, ECF No. 43), but did address this issue at the hearing.

Even considering the arguments presented by CellSight on this alternative basis for summary judgment at oral argument, the Court concludes that CellSight has not carried its burden to establish the absence of a genuine issue of material fact as to this element. Moreover, based on the single sentence and citation in CellSight's moving papers, it is not surprising that AntiCancer offered no opposition on this easily overlooked point, and the Court itself lacks enough information to assess whether summary judgment is warranted.

*D. The '038 Patent*

Pertaining only to the '038 patent, CellSight alternatively argues that it does not infringe Claims 1 and 5 of the '038 patent because "both claims require the use of tumors that stably repress GFP. CellSight has not used GFP expressing tumors in any of its work." (MSJ 9, ECF No. 36) Again, this constitutes the entirety of CellSight's argument on this point, supported by a single citation to Stout's expert report. (*See id.* (citing App. ISO MSJ Ex. C, at 126–27, ECF No. 38)) Stout asserts with regard to the '038 patent that the PRG Imaging Paper "is directed at PET reporter genes and does not discuss or relate to any methods monitoring metastasis of GFP expressing tumors." (App. ISO MSJ Ex. C, at 127, ECF No. 38) Again, AntiCancer does not oppose on this basis. (*See* Resp. in Opp'n 6, ECF No. 43)

//

//

For the same reasons given as to the '159 patent, the Court finds that CellSight has failed to carry its burden to establish the absence of a genuine issue of material fact, and declines to enter summary judgment on this basis.

**3. Unfair Competition Claims**

AntiCancer additionally asserts California common law and statutory unfair competition claims against CellSight, (Compl. ¶¶ 54–58, ECF No. 1), which CellSight seeks summary judgment on as well, (MSJ 14–15, ECF No. 36). These claims are premised on CellSight's infringement of the asserted patents.[10]

First, CellSight moves for summary judgment on the unfair competition claims on the basis that AntiCancer is not entitled to either of the remedies available under these sections—namely, restitution and injunctive relief. (MSJ 14, ECF No. 36)  CellSight is correct that damages are not available under California Business and Professions Code section 17200 ("Unfair Competition Law" or "UCL"); the available remedies are limited to restitution and injunctive relief. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1147 (2003); *Smit v. Charles Schwab & Co., Inc.*, 2011 U.S. Dist. LEXIS 25589, at *28 (N.D. Cal. Mar. 8, 2011). Courts are authorized to fashion remedies to prevent, deter, and compensate for unfair business practices. *See* Cal. Bus. & Prof. Code § 17203. To that end, California courts have found that injunctions are the proper remedy to combat unfair business practices, and that "[a]ctual direct victims of unfair competition may obtain restitution as well." *Korea Supply Co.*, 29 Cal. 4th at 1152.

//

---

[10] As to the statutory unfair competition claim under California Business and Professions Code section 17200, although the complaint generally states that CellSight committed "unlawful, unfair and fraudulent business acts and practices," (Compl. ¶ 57, ECF No. 13), the allegations go only to the "unlawful" prong of section 17200, and not to the "unfair" or "fraudulent" prongs. Moreover, AntiCancer's opposition appears to be limited to consideration of the unlawful prong, (*see* Resp. in Opp'n 9–10, ECF No. 43), and AntiCancer confirmed at oral argument that it was only pursuing the unlawful prong.

As CellSight states, in AntiCancer's complaint the unfair competition claims "are solely predicated on a violation of patent, trademark and/or copyright law . . . ." (MSJ 14, ECF No. 36)  Because the Court granted summary judgment as to the trademark claim and copyright claims, and because AntiCancer does not assert the violation of trademark or copyright law as a basis for its unfair competition claim in its opposition, the Court considers only the patent law violation as the predicate for AntiCancer's unfair competition claim. Again, AntiCancer confirmed that this was its position at oral argument.

In its motion, CellSight asserts that it "has not received any benefit or income that can form the basis for a restitution claim." (MSJ 14, ECF No. 36) But CellSight misunderstands the nature of a restitutionary remedy. The purpose of the restitutionary remedy is not to disgorge monies CellSight (allegedly) wrongfully obtained; rather, its purpose is to restore to AntiCancer monies in which it had an identifiable vested interest. *See Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal. App. 4th 997, 1012–13 (2005); *SkinMedica, Inc. v. Histogen Inc.*, 2012 U.S. Dist. LEXIS 56659, at *11 (S.D. Cal. Apr. 4, 2012) (Sammartino, J.) ("[N]onrestitutionary disgorgement, which focuses on the defendant's gain and does not require that the plaintiff suffered an identifiable loss, is not available under the UCL."); *Nat'l Rural Telcoms. Coop. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1080 (C.D. Cal. 2003). Thus, the Court **DENIES** summary judgment on this basis.

Second, CellSight argues that "[t]hese unfair competition claims also require proof of actual damage as part of the standing requirement for prosecuting these claims." (MSJ 14, ECF No. 36 (citing *Ruiz v. Gap, Inc.*, 380 Fed. Appx. 689, 692 (9th Cir. 2010))) Aside from stating the rule and inserting a block quotation from an unpublished Ninth Circuit case, CellSight offers no evidence or argument as to AntiCancer's actual damages (or lack thereof). (*See id.* at 14–15) Although the Court can surmise that CellSight believes AntiCancer has suffered no actual damages, CellSight does not even state this much, much less bolster the assertion with evidence in the record. As such, the Court **DENIES** summary judgment on this basis as well.

Third and finally, in its reply brief CellSight asserts an additional basis for why summary judgment should be granted: "[T]he Court should dismiss the unfair competition claims on the additional ground that they are preempted by federal patent law." (Reply in Supp. 8, ECF No. 45 (citing *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, 1439–41 (9th Cir. 1993)) Because this argument was raised for the first time in CellSight's reply brief, AntiCancer did not have an opportunity to oppose it, and so the Court permitted supplemental briefing on the issue following oral argument. However, AntiCancer elected not to submit a supplemental brief, and submitted on its opposition brief and the arguments raised at oral argument. (*See* Supp. Brief, ECF No. 52)

//

1 As the Court has already indicated, AntiCancer's unfair competition claim is predicated on CellSight's alleged violation of federal patent laws. *Supra* at note 10. As a result, both parties indicate that the Court's ruling on CellSight's motion for summary judgment on the patent infringement claims should drive the outcome of the unfair competition claims. (MSJ 15, ECF No. 36 ("[I]f the balance of this motion is granted, Plaintiff has no legitimate claim for unfair competition.")); (Resp. in Opp'n 10, ECF No. 43 ("[S]hould AntiCancer's first and second claims survive this motion, so also should its fifth and sixth claims for unfair competition.")) But "a violation of federal patent law—without more—cannot serve as the basis of this claim." *Halton Co. v. Streivor, Inc.*, 2010 U.S. Dist. LEXIS 50649, at *11 (N.D. Cal. May 21, 2010) (citing *Summit Mach.*, 7 F.3d at 1439). This is because "[f]ederal patent and copyright laws limit the states' ability to regulate unfair competition." *Summit Mach.*, 7 F.3d at 1439. "Where state law offers 'patent-like protection for ideas deemed unprotected under the present federal scheme, [state law] conflicts with the strong federal policy favoring free competition in ideas.'" *Id.* (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 168 (1989)). Thus, to avoid preemption, a state-law claim must be "*qualitatively* different from a copyright or patent infringement claim." *Id.* at 1440 (internal quotation marks omitted). This requires the state-law claim "contain[] an element not shared by the federal law," *id.* at 1439, such as an alleged breach of fiduciary duty, breach of a confidential relationship, or palming off of the defendant's products as those of its competitor, *id.* at 1441.

Here, as noted, AntiCancer argues that its unfair competition claims rise and fall with its patent infringement claim. (Resp. in Opp'n 10, ECF No. 43) In other words, if CellSight is guilty of patent infringement it has violated a federal law, which is sufficient to state a claim under the "unlawful" prong of section 17200. But this argument fails under the preemption analysis set forth above. Accordingly, the Court **GRANTS** CellSight's motion for summary judgment as to AntiCancer's unfair competition claims.

//
//
//

**CONCLUSION**

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** CellSight's motion for summary judgment. The Court **GRANTS** the motion as to AntiCancer's third claim for copyright infringement, fourth claim under the Lanham Act, and fifth and sixth claims for common law and statutory unfair competition. The Court **DENIES** CellSight's motion as to the first and second claims for patent infringement, however.

**IT IS SO ORDERED**.

DATED: July 24, 2012

Honorable Janis L. Sammartino
United States District Judge